# ST. LOUIS COUNTY GUARDIANS AD LITEM
# JAN 26, 2021 ZOOM CALL TRANSCRIPT

Transcribed from YouTube video "St. Louis Family Court Corruption" viewed at:
https://youtu.be/z_Re_bX118k?si=Kt4uoAJ8JA2uMvdH

**Sarah Pleban, Esq:** For all of us who practice as GALs, um, a lot of times we are not paid as much as other attorneys in domestic, and sometimes we are not given the respect as full attorneys. Sort of, you know, we've all had that. Like, I don't get an exhibit book. Why? What, what, you know? Or I sit in the jury box. **But one of the things we know is that we all have each others' back**. And that just, um, like, we surrounded Hank when there was that attack on his cell phone, and that produced something, we're doing this with Elaine, because they're…I think we have found there are strength in numbers.

[LEIGH CARSON, ESQ. enters Zoom call]

And, um, Hank was the one that suggested that we get together just like we did him. And you know, it was everybody - as soon as the email was out from Hank, with me it was yep yep yep yep yep yep yep yep. So that's what we are.

Um, Elaine is being, uh, we all get attacked as GALs, but this has risen to a new level that is so unjust and so harmful and consuming. I mean that 60-page suit is disgusting and it disgusts all of us. So what we're doing Elaine, as you know, all of us here are supporting you 100%. So this is to support you today, but we also want to do what we can collectively.

Um, Elaine…where are you in the case? What is just happening? What is before the court right now? Like, what's your next hearing?

**Elaine Pudlowski, Esq.**: So, um, procedurally, there's a Motion to Dismiss, um, that's scheduled for hearing tomorrow. And, um, so you guys probably have seen it in the Casenet that there's three defendants: Jim Reid, myself, Jennifer Webbe Van Luven. Actually, I guess there's five. And then they sue Jim's, um, company, and then Jennifer's company, West County Psych. So there's technically five, five defendants. I don't really know why they didn't sue my law firm, but they didn't. Um, so all five, all five have different defense lawyers. All five have filed motions to dismiss. And then there's also additional motions about protective orders…

Okay, I just got a note that maybe we're not having a hearing tomorrow. The judge just recused himself.

**Kelly Chevalier, Esq.:** Who is the judge?

**Pudlowski:** It was Judge Wallach.

**Pleban:** And I had heard that that was probably a good place to be. I mean, he studies the law, and he does all that.

**Henry M. Miller, Esq.:** I wonder if they're going to seek someone from a different county, since they're arguing that this is a systemic thing. (*deep breath, stressed look*)

**Pudlowski:** So I didn't know that, um…Liz, my law clerk just handed that to me right now. So, I guess I don't know where that leaves us. But, but basically that's what had been going on. So there's five, five different defendants. Um, my Motion to Dismiss is about judicial immunity, or quasi-judicial immunity, standing. Um, and then I asked him to throw in some factual stuff because on a motion for judgment on the pleadings…they had attacked, uh, in a quarter that I violated…which doesn't even make any sense. So that's what I have had pending. Um, they had

filed an amended petition alleging just, like, way forward factual stuff and bringing in all these other cases, uh, that I was on, so I think there was a motion she had there. I think all the defendants had asked for a protective order regarding discovery because of minors and other people, which the plaintiffs are fighting. So that, that was also set for today. Basically every - or tomorrow. Every motion… *inaudible* So I guess I really don't know where this is going to leave us. To go to the county? I don't know.

**Pleban:** Can I ask, like, by show of hands, how many of you are receiving the Daily…Docket - what's it called? *Daily Docket News*?

**Arthur H. Nissenbaum, Esq.:** I have to say, sometimes I get it, sometimes I don't.

**Pleban:** I don't ever get it.

**Justin Ruth, Esq.**: Don't you want us to put you on the mailing list?

*laughter from Elaine Pudlowski, others*

**Pleban:** Yeah, would you please?

**Jennifer Piper, Esq.:** I don't always get it either. Sometimes it goes to different people. It's weird.

**Sharon Remis, Esq.:** I was going to say, you know, they have different lists. Because in my office, Larry (Lawrence G. Gillespie, Esq.) gets it sometimes. Some weeks Larry gets it, some weeks I get it. And you know, sometimes it goes to my spam, and sometimes it doesn't. So it depends on the link that they're sending it out with, I think.

**Rachna Lien, Esq.:** Yeah, same here. And from what I've noticed, it's usually coming from the same email address, but, like, make sure that sometimes it goes to spam, sometimes it doesn't. Some weeks I get it, some weeks I don't. So, I don't know.

**Unknown:** Is it coming out weekly?

**Pudlowski:** It doesn't come out every couple weeks. There wasn't a pattern to it, but now it seems to come out, like, every two weeks on a Monday. But they do seem to change, like, who gets it. I never get it. Sometimes, Rachel, my associate gets it, sometimes she doesn't. Um, and then what they started doing was…now they've sent it to a board that I'm on. I assume they probably assume they're sending it to the church I'm part of because they've gone on my bio and seen, um, you know, who I'm a part of. So like these random neighbors of mine are like, "hey, why do I get this, uh, *Daily Docket News*? *What's going on?*" I'm like, um, okay, well, I'm being cyberstalked. Um, there doesn't come a different time today. So, like, Mark Haefner forwarded it yesterday, I mean Monday at about nine. The one to my board came in at about five. So, I don't know how that works in terms of how they circulate it.

**Chevalier**: Elaine, are you - are you wanting it to be sent to you? So we get it so you see it, or no?

**Pudlowski:** I mean, normally somebody sends it to me, so.

**Chevalier:** So, you want that, then?

**Pudlowski:** Yeah, I mean I want to get them, just so I know what's - what's being said. You know. I mean, I don't want to get them, but if they're out there, I want to get them, so.

**Remis:** Is your attorney getting them? The attorney that's representing you, is he getting it?

4

**Pudlowski:** Well, he gets some of them. So, I normally will forward them to him, and sometimes he'll be like, oh, I didn't get this one, and sometimes he gets them. Uh, same thing - like, one of my partners was getting them, then he stopped getting them, the other partner doesn't get them. It's just - it's very random.

**Remis:** The interesting thing is that they have, I mean, those…they're…they're, um, they have access to a lot of confidential information. So the question is, what's the resource?

**Pleban:** All right, this is gonna - I'm gonna dive into this. There is a concern that licensed attorneys might be getting this information and feeding it. And, you know, when it came out, um, Sara Marler sent several of us an, um, an email saying her client, in a paternity case, was sent something via U.S. mail about this. So how did somebody get into the court record on something that should be closed? Hank and I did this just this morning , a test. And when you're a lawyer, and you put in some, like - he put in one of my paternity cases, and that sort of thing. You can sometimes get it. And then sometimes, if you had the case number, je just got it even logged out. So that's something to take up with the court. For one thing, is it a lawyer? Is it somebody in the Circuit Clerk's Office?

[Kimberly Whittle, John Bridges shown as on the Zoom call]

**Chevalier:** I'm not trying to be mean…is more so an attorney not on the case can get it.

[Cynthia Albin, Sarah Wittrock shown as on the Zoom call]

**Pleban:** Or somebody's paralegal. Somebody's paralegal.

**Chevalier:** That's true…I'm not trying, right, I like my cord flip, I like the court form. (?) So it's not an answer, I didn't think out of the box.

5

**Nissenbaum:** Sarah, do you think there's something that you could raise with (Chief Judge) Burton, too? If somebody's got a case number, and it's a paternity case, that still shouldn't be coming up. You know, so maybe there's a problem within the security settings within the system, too.

[Deborah Roeder, Esq. pictured on screen]

**Pleban:** Yeah, I'll raise that. But Sharon, tell me again - and Sara Marler's case the plaintiff's attorney called…?

**Remis:** So, um, so yes. And, and I, and I will tell you, Larry got the call from the other attorney. So he could give you more details, Sarah. If after this call you even want to call Larry and get more information. I actually called. Um, I knew Judge - because I've been involved with this, and Judge Burton…with the email that you sent…that I put in a call to Judge Burton so he could look into that and I haven't heard back from him yet, but when I talk to his [inaudible] she's like, he's so overwhelmed with everything that…you know. So I have information about that. I can get that to you after the call. But. Okay, the attorney actually called the other counsel and kinda left a nasty message - that they do have saved. So that may be also something they want to access and contact that attorney.

**Pleban:** All right, so, Elaine is keeping a lot of this information to herself and her legal team, which I think is, um, a really wise course of action given how this net goes out. One of the things, Elaine, that, um, we wanted to bring up with you is if your legal team wanted to talk to any of us to see how we could help. And even though you're a lawyer when you're on this side of the desk, you really don't have the perspective all the time - you really need them. So, if you

6

want to reach out to them and say that any of us would be willing to talk to them to talk to them to see if we can help. And I don't know that we can, but we would. Okay?

All right, then that brings us to the next one. Elaine has, um, an expert. She has identified an expert. I don't know who this person is. I don't want to know. But they think that they might be able to uncover this. And this is where it gets costly. They, according to Elaine, they are either three or four tiers to the work that they do. And they've done the first tier, and it's come up with nothing. So then you go to the second tier. They feel that they may be able to uncover this. These people cost $425 an hour. And Elaine has been dragging her feet, saying no, no, no - nobody needs to contribute. No, I will do it. But I have gotten her to say that she will accept. Because Dave said that if Elaine thinks that that's not appropriate, maybe we get an expert on our own to try and do it. But it seems to be more efficient. So for those of us who would want to contribute to that, we need to not send a check to Elaine, according to her lawyers. We need to send it to one lawyer, and then they will send it to her law firm. Um, any discussion about that?

**Ruth:** Well, can I ask, is the expert a computer forensics expert trying to track down, you know, who's doing this and where this is coming from? And that's what…I was going to suggest that.

**Pleban:** Yeah.

**Ruth:** OK.

**Nissenbaum:** I think that's a great idea. I think that's our best chance. If we can really all pull together to do something, it's to try to financially support this and give them enough money that they may really be able to uncover it. Because I don't know how we're going to figure it out

7

otherwise. I mean, there are other things that may come in, but this seems to be the best shot at really trying to get somewhere.

**Ruth:** Well, I think it really makes sense to do it within Elaine's case, because then it kills two birds with one stone, hopefully. Which is, you know, Elaine can use it in her case, and then we know who it is.

**Amy Diemer, Esq.:** Elaine, have they given you an estimate of how much time they are going to spend doing this? And also, I have a second question: Has anybody figured out if there's a connection between this and Senate Bill 623 that was introduced and, um, because there was some real, um…

**Chevalier:** Can you repeat that, Amy? You've been dead.

**Diemer:** I'm not, what, pardon me?

**Chevalier:** You froze.

**Diemer:** Oh sorry, uh…I'm just wondering if this has any connection with Senator - well, he's retired now, but Senator Libla - L-I-B-L-A - he's the one that constantly introduced bills, um, that were taking away powers of guardian ad litem, or, um, adversely impacting our ability to do our work. Senate Bill 623 is the one that, um, ended up getting passed. There were some amendments, I think, that made it a little more palatable. But, um, he was really the driving force. And, this is all rumor - I don't have this, um, confirmed - but I think he is part of that "Mad Dad" group. So the first question, Elaine, was how much, how many hours have they estimated, they think they may need.

8

**Pudlowski:** Oh, um, they did it in, like Sarah said, tiers. They said, like, the first level. Bottom line is, like, twenty-four hours would be the max, most likely. So the first level, they would hope they could uncover something on the first level. They did find some stuff, but it's not super helpful. So then they said, second tier, here's what we could do. Um, and it may lead to something. The third tier is a little more unlikely. Um, like, they really have to, um…that would be more unlikely. So I would, I would doubt that, um, I would go to the third tier. Um, you know, if it's not likely after the second tier, I may just say, you know what, I've tried, and we've got as far as we could go. So apparently…

**Diemer:** I just did some quick math. So, even if you went up to the 24 hours, um, they're at $425…there's, there's 38 of us on the call, and I'm sure not everybody can help or may not be able to, or whatever, but even if everybody helped to get to the 24-hour level, that's $265 per person here. So…

**Pudlowski:** Listen, and Sarah alluded to this, I'm 100% doing this. You know I'm happy…

**Diemer:** You cannot bear this burden alone.

**Art Nissenbaum**: That's not OK. We need to be…we need to be in this with you, Elaine. Because it affects all of us.

**Diemer:** It's self-serving, Elaine. If you want to just, like, make yourself feel better about it, it's self-serving. You're just the first…I mean, we've all been hit with problems. Some of us have even had to file Orders of Protection against people. I mean, it's, you know, it's the nature of the beast. But this is at a level unprecedented. And um, you know, once they take you down, then we're all next.

9

**Pleban:** Just look around. There's only a very few of us who haven't been named. And those who haven't been named - we likely will be soon. Because they're adding. So they will be going after everybody they can find. And the man dead (?), it's interesting, because uh…I…a couple of these lawsuits are with women. Mad women. But I don't know. But I think Elaine thought that it might go as high as ten thousand dollars. So I know that she would not…we will just…if you want to contribute, whoever's treasurer here, um, we'll just send the checks. And that's it. And then, Elaine, you're not even going to know who's giving and who's not giving.

**Chevalier:** Who's the treasurer? Who's the treasurer, Sarah?

**Pleban:** Who's gonna volunteer?

[Shevon Harris, Esq. and Mark Kiesewetter, Esq. shown to be on the call]

**Laura Carson, Esq.:** I see Bill Grant, and he's not even on this damn thing. I know, why…is he not perfect?

**Pleban:** Because Bill and I were on the sunset of our careers, you know…we're going down. I don't know, will somebody be treasurer?

[Sylvia Pociask, Esq and Laura Stobie, Esq. shown to be on the call]

**Greg Brough, Esq.:** I'll be happy to be treasurer.

[applause]

**Diemer:** All right, hey, thank you Greg. Can you put your address in the chat?

**Brough:** Uh, sure.

**Pleban:** Bill Grant thanks you too.

**Ruth:** Can we just PayPal or Venmo you, or…?

**Brough:** Um, I prefer - I prefer a check. I'd prefer a paper trail if possible.

**Ann Bauer, Esq.:** I think it should be a separate bank account, I hate to say…

**Diemer:** I think you need to go on your IOLTA.

**Chevalier:** What do you want to call the…what do you want in the memo thing? Because if this is going to be an ongoing thing would you want to say "GAL Committee?"

**Brough:** Yeah, I think that makes sense.

**Pleban:** Wait a minute…does that…oh, like in the memo, is that what you said?

**Chevalier:** Yes.

**Pleban:** But we'll make it to Greg, right?

**Chevalier:** Yes.

**Diemer:** Or would it be better to put in there, "expert fees?"

**Chevalier:** Because what if there's too much…if there's more money than Elaine needs, then Greg would have to go through, figure it all out - who should get a return of their funds. But if you do the GAL fund, then if for other events we could use the money. So know: when you donate, you're not getting it back. Is that fair?

**Deborah Roeder, Esq.:** Yeah, that makes sense.

**Lien:** You could come up with, like, an informal name. Like maybe "The GAL Team Fund" or something that everyone puts in the memo line? That way, Greg is very clear. And then, at the

end of the lawsuit, when all this is behind us, if there's money left over, we can save it for

something else, or we can all collectively decide to donate it somewhere. Or we can kind of look

and see what the situation is then.

[Greg Brough posts address: Gregory Brough, 9666 Olive Blvd., Suite 690, Olivette, MO

63132]

**Chevalier:** Or a happy hour?

**Pleban:** Yeah, we have a victory party.

**Venus Jackson, Esq.:** So this is Venus - hi, everybody. Did you get the links of this email?

They'll visit like everyone in there and their, uh, cat.

[inaudible]

**Nissenbaum:** Yes.

**Jackson:** I wasn't sure. And I don't know how this person got my email. Like, I'm just trying

to figure out, uh, you know, what's going on - but I wasn't sure.

**Lisa Sigmund, Esq.:** You know, Sarah, and everybody - there were a lot of attorneys who

were included on all these emails that are not on this call and that are not GALs. I've kind of

been in touch with a lot of them, and I am certain that they would like to help, and donate, and do

whatever they can. Because they're being thrown under the bus as well. So this isn't just the 38

of us - this is larger than this call.

**Pleban:** I'm, of course, spreading the word, however we can - and getting more people.

**Shevon Harris, Esq.:** And did I - this is Shevon - did I understand, this is going in a separate account, correct?

**Nissenbaum:** That's correct.

**Harris:** Okay.

**Brough:** Does anyone have any opinion - I mean, I was figuring on using my trust account, but do you think I should set up a separate account for this? I mean I'll do - I'll do whatever.

**Harris:** Yup.

**Brough:** I'll do whatever.

**Jackson:** Separate account.

**Harris:** Absolutely.

**Brough:** You don't think a trust account is okay?

**Jackson:** You know, if you get audited, you'll get in trouble.

**Pleban:** Our OC/DC attorney is speaking!

**Harris:** I would certainly recommend a second account.

**Brough:** Okay.

**Harris:** Yes, this is not for a client.

**Pleban:**  That's a lot of work, Greg.

**Harris:** It is, and you do not want anything to happen to that IOLTA account, because it will be combed through.

13

**Pleban:** So can I ask something really crazy? What if we just made it to Greg?

**Harris:** That's fine, it wouldn't go into the IOLTA. He would deposit it into a separate account, obviously.

**Pleban:** It, like, just his own checking account. Because I trust Greg to use the money and if there's leftover, uh, we all figure out what to do with it. But…would that get him in trouble?

**Bauer:** I don't think it's a matter of trust. If we want some reports, Greg needs it to be so he report it as a separate item. Also, we can name it whatever we want, but that would require opening a bank account in the name of an entity. So, much better to have Greg account for it, um, you know, by a separate account, or by some kind of…I don't know.

**Lynn Reichert, Esq.:** Does that have a tax implication for Greg?

**Colleen Hubble, Esq.:** Opening a separate account is going to be an enormous hassle.

**David Betz, Esq.:** May I make a suggestion?

**Nissenbaum:** I think it would be too. If Greg could just keep track of it himself on a sheet, we all trust him. It's not a, it's not an issue there, I don't think.

**Betz:** Is there any reason we could not pay directly Elaine's forensic company? They could establish a link and we could contribute via their link?

**Pleban:** I don't think Elaine wants that out, who it is. That all…there's paper trails. Look at who's infiltrated. So I think it's gotta go through her lawyer.

**Piper:** I think Lynn's question was very important. Does this create a tax problem for Greg?

**Nissenbaum:** I think if we have it made out, like we're talking about, and he's keeping track of it, then it's clearly not income to him. It would be that he's just parking it in his account.

**Mary Davidson, Esq.:** If the IRS were to count it as income, then he would have a check, presumably a big check to the forensic person, whoever that is, that would then balance that out, right?

**Nissenbaum:** That's right, that's right.

**Brough:** Guys, I think the approach I'd want to take would be just to put it in my trust account. And I understand that that may create problems, but I mean, I just kind of view that as where I put money that doesn't belong to me. And so, I mean, I'd like to put it in there and then write it out of there, and keep my accounting that way. If that would work for everybody.

**Reichert:** Okay, Greg, be sure you listen to what Shevon Harris has to say. She's on the disciplinary committee.

**Piper:** Aren't we a client as GAL team, though? Aren't we kind of considered a client as, like, a GAL Team? Kind of?

**Ruth:** Couldn't you open up a matter in your firm? For Elaine?

**Piper:** For us, as the GAL Team?

**Nissenbaum:** For us as the GAL Team.

**Harris:** Under…in the operating account, yes.

**Pleban:** Oh, okay, not trust, but operating. The other thing - we finished that, right?

**Ruth:** To be clear, how do you want the check made payable, and do you want anything in the memo?

**Brough:** I think payable to me and GAL Committee, or whatever we want to call it in the memo so I know what it's for.

**Ruth:** Well, if you're going to be generating a new matter, shouldn't we just call it that? Like, how are you going to open up the matter in your firm?

**Brough:** I think I'll call it GAL Committee if that's all right.

[Matt Eilert, Esq. and Cynthia Albin, Esq. visible on call]

**Ruth:** Then I think the checks should be made payable to your firm.

**Brough:** You're looking at my firm.

**Ruth:** I don't know, I haven't seen one of your pleadings in a while. Is it Greg Brough, LLC?

**Brough:** No, it's just Gregory Brough, Attorney at Law.

**Ruth:** All right, then that's how I think the checks should be made payable. And then, in the memo, "GAL Committee."

**Betz:** I recommend that we generate an email with all of this information. As it was pointed out, there's non-guardians and other guardians who haven't participated. We may as well generate "this is what's happening." Do you agree?

**Pleban:** Uh, sure. I don't know that I'll get everybody else's email on there. I think I need to get Shevon. I don't think I have you on my list. What's your email, Shevon?

**Harris:** slhatty@aol.com - I'm revealing my age with that.

16

**Pleban:** I have Gmail, so I'm even older. Um, let's see, who else?

**Cynthia Albin, Esq.:** Are we comfortable forwarding this email to other attorneys who may want to support the cause?

**Pleban:** Uh, Elaine?

**Nissenbaum:** Is there any downside to that? If there, these people kind of have access to things?

**Pudlowski:** Uh, let me find out. I'll ask my attorney and see if he has an issue with it. I had told him before that there were, um, certainly other guardians and family law professionals that were very upset about what was going on and invested in working with the expert. He said he didn't have any problem, as long as I wasn't spearheading it, you know.

**Ruth:** Not to put too much on Greg, but should he put out the emails under the heading of "GAL Committee?" I mean, that way, it's all going through Greg, and you know in, potentially, you can argue that we're all his clients, or…

**Hubble:** Once we start sending him out to more people, if we're his clients, it's kind of closing that client confidentiality to the extent we might need that with the people attacking us.

**Nissenbaum:** That's where I think we need to find out from Elaine, from her lawyer first. You know, do we really need to keep this quiet or is it just going to become part of the scheme, you know, and they make an even bigger deal out of it if they figure it out?

**Remis:** And are we opening up some sort of a, you know, if we've then creating some grouping or class or something, does it change kind of what happens?

**Pleban:** Does it change what happens in what respect?

**Remis:** If we're opening up some…I mean, they don't have to have an actual cause of action to file a lawsuit. So if we somehow have some committee that they come across, or something, do they then have, then, somehow file a lawsuit against every single person who's on this, you know, committee, in some sort of a - again a class action of something else. Even if it doesn't exist, I mean, they made up a whole bunch of things in the lawsuit against Elaine. I mean some of the allegations aren't even legal theories. But they still said it. So could they do that as well if it becomes too public?

**Ruth:** And my concern is if we think there's some mole, so to speak, that's funneling information, we don't know who that is.

**Nissenbaum:** Right.

**Ruth:** One of these emails lands in somebody's inbox. And it's got 48 attorneys on it. I mean, I don't want to make this more than this is, again, more than it is, but it's not hard to incorporate a quick LLC. For the purpose of, for the purpose of, you know…

**Nissenbaum:** But that legitimizes them trying to sue the corporate…so if we're not an entity, I don't think they can do anything. Um. But I really think we should be guided by whatever Elaine's attorney tells us. You know, we need that information, I think. And they know what's going on here, so that may help us a little bit if we get some advice back from Elaine.

**Pleban:** Well, I think she did speak with them this morning, and they said send it through another lawyer. Right, Elaine?

**Pudlowski:** Right. Yeah.

**Nissenbaum:** But I'm talking about the email itself, if we're all on something. You know, is there something that they might see potentially that could backfire in some way. I don't know what it is, but it seems, you know, you just don't know what how something may be used, or what they may do with that. And I think Justin's right about the point if there's a mole in here somewhere that we don't know about, or it just starts getting sent out and gets sent to somebody, what are they going to do with that? Um.

**Miller:** I don't think there's any need for an email. We're all taking notes, and we can all proceed from here.

**Sylvia Pociask, Esq.:** I agree with Hank. If we're worried about emails, we all know each other. Word of mouth other attorneys "Email a check to Greg."

**Nissenbaum:** I think that way we know, if we would know them, that would mean somebody's approached us about it. Or we heard about it from somebody. It gives us more control over who that is.

**Jackson:** I agree. The less paper trails, the best.

**Pleban:** I'm trying to see who isn't on this call, so I could reach out to them specifically. Uh, Jill Patton isn't, is he? Ken Graves I know said that she might have had another thing.

**Nissenbaum:** Right, we need to let her know.

**Diemer:** I know Simone (Haberstock McCartney, Esq.) had another thing, too.

**Pleban:** Venus, Harry…Ron Wessel…(Brian) Dunlop…Joan…I don't know who Joan is, do I? And then Celeste.

**Jackson:** Can you add, um, Brandy Miller on there as well?

**Pleban:** Yup. Okay. All right. So, I think we got the money taken care of. We're just sending a check to Greg. The other thing maybe that, you know, there's…I have…Hank and I have been batting around some ideas about what could be done to uncover who's doing this? And opposed to just batting them around here, maybe send an email? Uh, to Elaine? Just with your idea of… what could you, what could we do to uncover this? And…other than that, the meeting is this afternoon that Judge Burton is calling. And I think it…now that more judges are being called out and named, I'm sure it has gotten their attention. But this threatens to take down the entire system. When judges are in on it, um…I would…I have taken Elaine to task, though in this "Cash for Kids" scheme that I was originally named in. I haven't receive a penny! I don't know where that money is!

[laughter]

**Betz:** On top of that, you're running a Ponzi scheme, Elaine? How dare you! *laughs*

**Nissenbaum:** We should all be really wealthy by now! *laughs*

**Pleban:** I mean, when you're selling kids, there's got to be some money attached to that.

**Brough:** That's an idea, we could adopt the identity. We could call ourselves Cash for Kids!

[laughter]

**Pleban:** Oh yeah, LLC!

[laughter]

20

**Pleban:** It is growing. I've got a case now with Laura where the Mom's really mad at me all the time, but one of the things, among the many threats that she's done is that "I know four or five other families, and we're getting together and we're hiring a lawyer." Um, I don't know as she is. A lot of what she says isn't the truth. But there's a part where she certainly knows about this stuff.

**Nissenbaum:** You know, it going to be an attraction for the people, you know…there are always people that are pissed off at us. Um, so. One other question I've got, Sarah is: are the judges - I'm assuming they are - but are they now beginning to be pretty versed in this? And do they know I hit a trial on Friday where I…Dr. Reid was testifying, you know, having done the evaluation, and, um, I objected to the question when he was asked whether or not there was a lawsuit, and you know were there lawsuits against him and I brought this up as an issue. And it was in front of (Judge) Zellweger. I don't know whether she really knows that much about it or not. I mean is there…

**Pleban:** She overruled the objection, didn't she?

**Nissenbaum:** Yes, she did. And I likened it to, you know, that, it's just an allegation, you, you know, it's not, it's not probative. I said it wasn't probative evidence.

**Pleban:** Like being arrested.

**Nissenbaum:** Right, exactly. So, but it was overruled.

**Pleban:** I don't know if she does or not.

**Nissenbaum:** Is Judge Burton…have you had…has anybody had conversations with him so that he's, so that he does understand what's going on with this?

**Jackson:** He does. He understands this. He's reached out to - I know he reached out to Mound City Bar Association to ask for a representative to the meeting today. So he is taking this very seriously. Because forwarded to, I think, all of the bar associations. Um, I don't know if all the judges, but I do think that every that does domestic, um, should be aware of it, because the last email mentioned [unintelligable], mentioned Bruce, mentioned a couple other people, so if they're not, um, if they're not abreast of it, I think that we should, whoever's at the meeting should bring that up to, um, the judge that, um, this issue was there. But I do know that he's aware of it because he's reached out to bar associations.

**Pleban:** I will ask today, I but I think that like Venus said, he's incorporating…but that's something that they need to get a hold of.

**Nissenbaum:** Right. Yeah, I just don't know if, how much they know about it, and how much it's filtered down to the other judges. And I can't be at the meeting this afternoon, so I just want to make sure that gets addressed.

**Ruth:** Is someone attending that meeting this afternoon?

**Pleban:** Yeah, I am.

**Ruth:** Do you want to just bring it up, as an issue that we see and making sure that Burton at least make sure that the domestic judges are aware of it?

**Pleban:** Yep. I will.

**Reichert:** Don't forget that Zellweger may have just let it in so it's not an issue for appeal. That doesn't mean she's giving weight to it.

**Nissenbaum:** That's, that's a good possibility. You know, and it does avoid that.

**Pleban:** Maybe, but we don't…we don't have many people to do custody evaluations.

**Nissenbaum:** No.

**Pleban:** The pool is *gestures* this deep. Um, so I'm sure everybody has some pros and cons about Jim Reid. I mean…but he's one of the substantial ones. And if he's knocked out, or he says, like Elaine does, and like Jen's getting ready to do, "I don't want to do this anymore, it's not worth it," then where are we?

**Nissenbaum:** That's the really big danger here that I think we all have to be aware of - and that the judges in the court need to be aware of. Because if they start losing guardian ad litems [*sic*] and we don't have therapists and counselors and psych, forensic psychologists who will do this work…I don't know what they're gonna do. And, you know…so…it's really, it's a really far reaching issue.

**Pleban:** OK.

**Pudlowski:** Okay, these are going - just so you know, these are going out to therapists also. Um…and I don't know where they get their names, but I've had a couple therapists that I work with that I know they're getting the letters. So, um…and I don't know how that works, and maybe you do. Maybe you guys have license addresses like we do, but I'm getting lots of calls from people about that kind of stuff. And the number of therapists that will work with families that are in litigation is also a small pool. So those are going to be shrinking also. I mean, I already have tons of people that won't call me back, and I don't take it personally. But when I call and say, "Hey, I've got a case, would you be interested?" Nope, nope, nope, nope, nope. You

know…and now what? Now no one's going to. Um, you know, if I mention, oh by the way the last couple cases I referred to people they got sued on…so…that's another problem.

**Nissenbaum:** That's a huge problem. And that's why, you know, we're going to end up and the court will end up in a really, really sad situation if we can't really seem to get a handle on this somehow.

**Ruth:** Well, I mean, I was actually curious: are people actually considering stopping GAL work? I mean…I know some people probably aren't in a position to do that. I've certainly considered it.

**Pleban:** I haven't…I don't really have any other kind of business.

**Ruth:** I understand. I was just wondering if…I was just wondering if that crossed anybody else's mind.

**Pleban:** Yeah, it crossed Jen's mind. I gotta go to the other screen. I don't know if it crossed anybody else's mind.

**Miller:** Yes.

**Nissenbaum:** I think it's crossed almost everybody else's mind.

**Miller:** Right.

**Jackson:** My clients…the claims I get on my GAL cases, the clients don't have money. So I'm kind of in the back…I'm supporting, I'll do whatever I need to but…my clients complain all the time but most of them don't have money for…anything.

[Molly Murphy, Esq. shown to be on the call]

**Nissenbaum:** I don't want to give into it. For a lot of us, I don't think we want to give into that…the same way we used to talk about for a while when attorneys were trying to DQ us all the time. Um, you know you don't want to give into that, and, and, I don't, you know, think any of us really want to give into it, but if it gets bad enough, yeah, I think probably - I can't imagine it hasn't crossed almost everybody's mind that's in this room.

[Phelan Gallig, Esq. and Nicollette Klapp shown to be on the call]

**Diemer:** Has anybody ever looked into whether this is happening in other jurisdictions or other states?

**Pleban:** *Daily Docket News* says they are, they're just hot, they're highlighting other states, too. I don't…I think that's baloney. Or like they have a million readers nationwide.

**Betz:** They allege they're incorporated in the state of New York, and…I searched the database, and I couldn't find them. So I suspect it's just bullshit.

**Pudlowski:** It's a fake - I hate to say this - it's fake news. Um, there, there is no such thing. Uh, Simone - uh, I don't know, you guys are probably on it - said apparently it's going out to some other counties. And one of the ones where they mention a lot of GALs, there were a couple people I didn't know. Oh, I think Sara Marler told me that. Like, some of these were some out-of-state people that they had found. Um, and apparently, they're sending it to Kansas City, Columbia, um, Jeff City. I don't know if it's getting any traction out there, but apparently this, this particular stop is going to those people, but…

**Nissenbaum:** You know, it's important to remember that a lot of the people that we see that are so difficult in our cases are personality disordered, and people with personality disorders will

25

take an unbelievable vengeance. They will not stop at anything. Studies have actually shown that a lot of them love litigation because it puts them in the spotlight and it gives them an audience. And so, I think we have to be aware that whoever's behind this, most likely, is somebody like that, and they are a group of them, and they're not going to easily stop. You know, the fact that they're getting anywhere will I think actually fuel them in some ways.

**Jackson:** I have a question. Do you think this has any impact on the, what we originally started this group and talked about, was because of the legislation about change in GAL standards and things like that. I just have a fear that if this continues, that's going to give even more traction to ratifying the GAL standards and things of that sort. And, I just, you know, it's hard enough to do our jobs, but now we gotta…I don't know, I just feel some kind of way about it. I feel the GAL standards, it's a part of this whole…thing.

**Nissenbaum:** I think ultimately you certainly could be right. You know, I think when all this stuff started, and yeah, that would again give him a whole lot of fuel. I think this is a way to go around that, though and try to destroy sort of destroy the system in another way. Um, so. You know, all of these are reasons why I think it's really important for us to try to do whatever we can. Um, to try to get to the bottom of this.

**Betz:** So, I'm sorry Simone's not here. Some of you may know, Simone has started essentially a non-profit lobbying group for guardian ad litems. And that was founded initially to address the legislative issues that Amy referenced earlier, um, in our Zoom session. And that's probably where a lot of our energies will probably need to be focused, going forward, is to think how we can protect ourselves more from a statutory perspective, which may need to be extended to add

counselors, giving them qualified immunity when they are appointed under family court litigation. We need to probably pursue more statutory protections than we've ever contemplated to incentivize qualified people from participating in this world.

**Pleban:** You're from that group, aren't you, Dave?

**Betz:** I am, yeah.

**Nissenbaum:** And that is really, that's a really good point, David. Because, you know, our legislature is so crazy that it's scary to think about what they may do. I mean, I read yesterday, I know they're trying to pass a bill that you can use deadly force against protesters. So, um, you know, it is really scary to think about what they may do. You're right, this is a, could be and adjunct to what Simone's trying to do. Or if we can figure this out…it's, you know, we'll come at it that way, too.

**Pleban:** There's, uh, the County Bar is having a law, and it's a GLA, a GLA…GAL, what are we? Seminar on March 4th. You'll get your advanced hours. It has, like, two hours of ethics, uh, of diversity. But one of the topics is Scott Sifton, who just, uh, turned out of the Senate, Sarah Unsicker, and Simone talking about legislation, what's coming up, and what we can do. Um, so that's one of the topics. I think you'll get information about it soon.

**Lien:** Is that an email, Sarah? Can you send that to us?

**Pleban:** Um, I don't have it yet, but it's March 4th. I think it, um…Lisa Moore is putting it together but Jen and I have helped, but…it's going out soon, right Jen?

**Piper:** Yeah, you guys will have it very soon, but just mark your calendar. It's a full day and it's, it's really great.

**Pleban:** Yeah, I think there's some good topics. I mean there's, it just really is some good topics.

**Piper:** And it covers your diversity, too. I don't know if Sarah hit that one. It covers everything you need.

**Pleban:** Okay, all right, I think we've, we've got everything, we had a good meeting today. I think our purpose and how we can help Elaine…we're there. And again, we're there for you, to support you emotionally too. Because I can't imagine the angst that this causes you. And it shouldn't happen to you. We know that. We do not want to lose Elaine as a GAL. Shouldn't happen to anybody here. And because somebody has decided they can do it, we're not just going to be passive and not try and help you. And help ourselves. Okay?

**Pudlowski:** Okay, thank you everybody. I really appreciate it.

**Nissenbaum:** And thanks to Sarah and Hank for getting this organized to get us together.

**Pleban:** There's strength in numbers for us.

**Nissenbaum:** There sure is.

**Pleban:** OK, thank you.

**Betz:** Thanks everybody.